Thank you so much. And Mr. Burroughs, whenever you're ready. Thank you, Your Honor. My name is Scott Burroughs. I represent the plaintiff, Dr. Elliot McGuckin, in this matter, and may it please the Court. This appeal presents a number of issues, but I want to start by homing in on what I think provides the most straightforward path to a reversal. And that is what Shutterstock did after ingesting the photography at issue. As we mentioned in our brief, Shutterstock vets its contributors. You have to apply to be a contributor. You have to apply to even provide photography in the first place to Shutterstock's platform. And then you have to submit your photography to its global team of creative professionals to review before it's even ingested into the system. Now, Judge Reardon at the District Court actually found that there's a review process as a factual matter in her ruling. But I want to focus on what comes next, because that's what sets this case apart from all other 512 cases. Because after the photography passes the two-step vetting process of Shutterstock, Shutterstock places it in its online store and then starts licensing it. It starts distributing it to third parties. And that makes this ruling one of a kind. No court has ever before extended the Section 512 safe harbor to folks who are licensing and selling content. Wait, wait, wait. Why do you say that? I mean, haven't there been cases about platforms like Amazon, for example? No, Your Honor. And Amazon is distinguishable because in that case, the court finds that Amazon isn't a first party to the transaction. Here, and Judge Reardon found this at the District Court, Shutterstock issues the licenses. Amazon is not selling the product for which it claims 512 protection. If Amazon is selling the product directly, then yes, it has 512 protection. But when it's operating as a platform, such as eBay, where third parties are selling product through the platform, then it does have 512 protection, because it's not a first party to the transaction. If I'm selling- Doesn't that require us to have a definition of online service provider under 512c? And then how would you, what are the physical words that you would recommend that we write that you think puts, that would allow your client to prevail? Sure. Well, an online service provider is one that, by definition, provides a service. And a company can provide a service while also engaging in business. This was raised in the YouTube case where they said, look, you can be a platform and that may be protected by the safe harbor. But if you enter into transactions- This is a lot of words for when I ask for a definition. Like, I mean, we have to write an opinion and there's going to be a winner and loser in that. If you could articulate what you think we should say the definition of an online service provider under 512c is, that would be very helpful. An online service provider is one that does not enter into transactions, where it's selling the content that it sources from its users, and it's one that provides a passive platform. So then you're saying that the issue here ultimately comes down to the thing that you raised like third in your brief, which is that they are not a service provider as defined. They can be a service provider, Your Honor, but still not meet the requirements, which is that it doesn't- Okay, so you don't need us to redefine service provider. Service provider can be very broad. You're suggesting that the issue has to do with meeting the specific requirements for the specific safe harbor. That's exactly right. Even if we spot then the online service provider definition, they still don't meet the safe harbor because they're distributing the content to third parties. I wonder though how much of a difference that really makes. If I understand properly, and maybe I don't, I thought that when they licensed the products, they're operating kind of like a vending machine, that they've set terms with their original contributors, and then all that happens on the consumer end is automatic. I understand your argument that at the producer or contributor end, it's anything but automatic. But at the consumer end, you put in your nickel and you get your license. Isn't that the way it works? The fact that it works that way on the consumer end isn't relevant under the 512 analysis. The fact as to whether or not it's automatic may be relevant to the content they're sourcing when they're onboarding it from these users. But if they're selling it automatically, that doesn't make any difference under 512. Why shouldn't it? You suggest they're acting as an agent, but unlike a typical human agent, they don't represent the content provider and engage in negotiations and try to advise the client what a good licensing fee would be and take it or leave it on behalf of that person. Once they've got it up, the terms are set and everything happens without human hands. Why doesn't that make a difference? Why doesn't that tend to make them look like a passive service provider? They get a profit, but they could do it either way. It doesn't really make any difference what Amazon does, does it? It's providing a platform for people, whether that's a platform on which they take their cut as a middleman or they take their cut as simply the fee for using their service. They're acting more than an agent. They're acting as the first party in these transactions, and that's why this case is different. Why isn't that just nominal? Why does it matter what they call themselves or that they become a party if what they're doing is functionally the same as providing the marketplace? Because 512 only protects platforms for infringing acts that are committed by reason of storage of the content at the direction of the user. And it's impossible to argue that when Shutterstock is licensing content to third parties that the user is involved. The user is not a party to that contract. In fact, when we had to file dozens of cases against the licensees for the infringing content, each of those licensees is responsible as strict liability infringers, but the actual contributor, this user, has no liability because the user is not in contractual privity with the licensees. The user provides the content to Shutterstock, and then Shutterstock enters into its own deals with each of these licensees. And those licenses are not by reason of the fact that the content was stored by a user direction. It's just, they're not part of the case. There's no privity there. So even if, and that's why I want to go back to the beginning, even if the display of the content on Shutterstock's site was as a result of solely user conduct and Shutterstock really was passive, which we highly dispute because they review every piece of content before it goes live on the site. It's not like a YouTube, where I can go to YouTube right now, I can put a video up on YouTube and it shows up right away. That's not how Shutterstock operates. So you're effectively saying that Shutterstock is breaking a causal link between the contributor uploading and whatever happens next because Shutterstock has gone in and done a few things. I mean, is that effectively what you're saying? That's absolutely part of it, Your Honor. And that's happening in two ways. One, they're vetting the content. It's not like YouTube, where you go there and you put it online and it's up. Shutterstock has to look at each piece of content and approve it before it sells it. So my question though is, is that an issue of fact or an issue of law? Because what you're effectively asking us to do is to say that there is a broken causal link. Is that something the jury should be deciding or is that something we should be deciding? At a minimum, there's a tribal issue of fact here, Your Honor, because you have two competing sets of facts. You have Shutterstock saying, we don't really review the content, and then we have our evidence through deposition otherwise saying they heavily review it. You can go to Shutterstock's website right now. But is it, if it's line drawing like that, if saying that these are the kinds of things that they're reviewing and these are the kinds of things that they're not, are those, are those, are those fact questions or are those law questions? I think they're mixed questions of fact and law. There's factual determinations that need to be made because we do have testimony and evidence on both sides as to what Shutterstock is doing before ingesting the content. But there's also line drawing because we think that the law should be, and this has been the law, and there's cases, the ReDigi case touched on this, but if you're entering into first party transactions and distributing content, the user is not involved in that. That's not by reason of any sort of user conduct. And so even- What's the, can you just explain for me what you think the significance is of the level of review? Like the difference between, let's, well, I assume you would agree that some type of review either for inappropriate content or inappropriate materials would not change the status. I assume you would accept that there's some type of review that can happen that does not take you out of the 512 world. Yes, that's the 512M content, obscenity, pornography, things like that. But Shutterstock goes well beyond that. And ironically, infringement, right? You want them to look at the things and say, we're not taking this because you're infringing the photographer's content. If Mickey Mouse is in the photograph and they see it, yes, that's all 512M, but of course Shutterstock goes far beyond that to look at things like composition- They do aesthetic vetting is what you're saying. Yeah, noise, composition, and they provide extensive, extensive instructions to contributors. Which makes them look more like Life Magazine than like YouTube. Exactly. That they are selecting the photos that they want. Now they may be more promiscuous than Life Magazine and take a broader range of content and not select highly curated individual photos, but they are rejecting photos on the ground that they're not good enough to be on their site. Exactly. They're not, as Shutterstock calls it, the professional quality that they provide to their- I mean, that is standard content. That's not 512M obscenity. That's content. To get back to the fact law business, you're not saying that we should reverse and grant a summary judgment for you. I believe that you can. I didn't say that. I said you're not asking for that. I didn't see that in your request for relief. We believe that there's at least a tribal issue of fact because of this competing evidence on almost every issue. But there is some sort of issue of law lurking there where we would have to define to some degree what it is that the jury has to decide. Precisely, Your Honor. Precisely. And here, because we have this interplay between Section 106, which is the part of the Copyright Act that sets out the bundle of rights, one of which being display, one of which being reproduction, and one of which being distribution, and 512, which only immunizes those violations that are a result of user conduct. Here, this court could rule that even if the display and reproduction are a result of user conduct, which I think is impossible, but the court could rule that and still find infringement and still direct the lower court that these distributions, these 938 licenses to which the user was not even a party, those 938 licenses were 938 violations of the Section 106 distribution right. And because CC bill, which we cite, addresses this out of the Ninth Circuit, but it's absolutely possible for a site to be covered in some ways by 512, but not in other ways. And here, something that's telling, I believe, is on page 48 of the appellee's brief. They note that their two main competitors are these companies, Alamy and Getty. And both of those competitors who have the same business model have been found to be outside of the Section 512 framework. Why? In the Alamy case- Have they been so found by courts of appeals? Not by courts of appeals. Basically, they've both dropped those arguments. It's only recently now that any of these licensing companies have come out and said, oh, wait, there's this ruling out of the Southern District of New York that says that we can sell licenses for content and still have 512 liability. After the previous cases, they wouldn't even make this argument. You may remember in the Redigi case- Well, I mean, that's all as it may be. But the point is, there is not, certainly not any authority binding on us, and indeed, there is not any circuit authority. This would be something that we would be deciding as a matter of first impression for a federal court of appeals. Well, we do have Polyvore, Your Honor. That's the most recent and on-point case. And in that case, it looked at the distribution right. And it found that if- because, again, we're going back to- Of course, there is no majority opinion in that case. Well, it's per- yes, that's true, Your Honor. There's a period that says one side wins, one side loses. And then there are three different interpretations of what it is. Right. But what they all seem to agree on is whether or not making a copy that's not solely to show it to the public is an infringement. That's why it's remanded back to the district court. And here- But that's about the making of copies, you see. That's, again, entirely different than the argument- you could win about five ways conceivably. And we might have to pick one if we think you do win. But they're separate arguments. The argument about making extra copies is one sort of thing, which they're defending on one sort of basis. What you've just been talking about and what mostly we've been talking about is the distribution right where the license gets given. Right. That's correct, Your Honor. But I wanted to focus quickly, though, on that reproduction right because that's a part of the district court's decision that seems to be most glaringly incorrect because in Polyvore, the court- I thought you said the other one was the most glaringly incorrect. They're very close, Your Honor. The Polyvore court said, look, there's not enough evidence in front of us to determine whether or not Polyvore made more copies than was necessary to simply show this work to the public. Judge Reardon found that there was evidence in this case that multiple copies were made and that there wasn't a showing that they were necessary to show the work to the public. But then after making that factual finding, she found that there is 512 protection when Polyvore said the opposite. Yeah, isn't that just parasitic on the question of whether what they ultimately do with the content is within the safe harbor? Because if it is, then it seems to me all the copies that they make internally are part of that process. Which is why it's important here that there's three copies that were made publicly. And that's why, per Polyvore, they didn't need to make three copies if all they were going to do was show this to the public. But they made three copies because they were trying to sell it to the public. And that brings it outside of the scope of 512. Well, that's the point. In other words, the issue of making three copies is not an independent problem. The problem is if the licensing is what takes them outside of the safe harbor, then it doesn't matter how many copies they make in the pursuit of that project. If that project is okay, I don't see why it would be different that they had to make three copies so that the user can see it different ways before choosing it. If the project of licensing is still within the safe harbor, then I don't see why the making of copies that are in the interest of that safe harbor project is any different than making copies in the service of the project of putting something there to be viewed. I can address that, Your Honor. It's important because, as I mentioned, Section 106, which lays out the exclusive rights, has a bundle of rights, each of which is discrete, and the violation of any of which constitutes infringement. So here we have a violation of at least three. We have a violation of the reproduction right, because they made three reproductions. We have a violation of the display right, because they're displaying it without my client's consent. And we have a violation of the distribution right, because they're distributing licenses to their 938 licensees plus their third-party ad partners. But any one of those could be within a safe harbor. Whether this is or is not within the safe harbor is the issue for us, but I don't think there's any distinction that reproduction rights could somehow not be within a safe harbor if what is happening is within the safe harbor. And, Your Honor, that's the exact point that I'm making. If, for example, the display right is covered by the safe harbor because it's, quote, at the direction of the user, then that could be covered. But the distribution would not be covered, because the user isn't making Shutterstock license. Shutterstock's entering into these licenses on its own volition. It has the unfettered discretion as to what it offers in its store and what it licenses. And it sets the terms. It sets the prices. It sets every possible provision of these licenses. And so it's entirely possible for this Court to find, well, maybe the— Okay. I have your argument. Thank you, Your Honor. And I'm a bit over on time, but— Well, you're a lot over on time, but that's up to the presider to give you more if more is required. I'll save it for rebuttal. Thank you, Your Honors. All right. Thank you. Good morning. May it please the Court. As Judge Rudin found, and as any observer familiar with the DMCA would see, Shutterstock's platform not only meets the DMCA, but it fulfills the promise of the Copyright Act. It connects hundreds of thousands of creators to licensees of all types, a huge audience of people who want to pay these creators for their work. That's the point behind the DMCA. That's the goal behind the DMCA. But even if you look at the elements, it's clear that Shutterstock checks all the boxes. My adversary suggests that perhaps we should say that certain types of rights are excluded from the DMCA or certain types of activities are excluded from the DMCA. That's not really how I understand the argument. I understand the argument that there are things specific to what Shutterstock does that takes it out of the safe harbor. Can we focus on the argument that the review of what Shutterstock does breaks a causal link either for the direction and control of the user and with respect to the right to control infringing activity? Absolutely, Judge Perez. This is actually a somewhat different argument than we heard before. No, I think it's exactly the argument that's in their brief. He happens to have three of them. He thought one was the best. We're asking you about a different one, which he did raise in oral argument and he did raise in his brief. That's why Judge Perez asked you the question and that's why we'd like you to answer it. Thank you, Judge Lynch. Let me set the context. The context is, as the courts found in BICOM versus YouTube, as was found by the Ninth Circuit in UMG versus Shelter Capital, there just needs to be some causal connection between what happens. The way that was characterized by my adversary is not what the record reflects. There's no vetting. There are 200,000 images that come in a day. There are two million contributors. The vetting is really for obvious technical errors. Is that a question of law? He's arguing that there's a dispute, which we can leave aside for a moment. Assuming that there is no dispute as to what Shutterstock is doing, is that a question of law or a question of fact for us to... Yes, Your Honor. It's a question of law. All of these cases, Vimeo, BICOM versus YouTube, all of these cases have been resolved on summary judgment in the instances where they have not, including in the other direction. There are cases like Fung and MP3 tunes where the parties did have some ostensible safe harbor protection, where they distributed content, just like here, although obviously they were bad actors in those cases. But in this context here, all of these cases, notably, have been resolved on summary judgment. There's no real issue of fact here. There have been efforts to mischaracterize the view. Are there cases where there was evidence that Shutterstock itself represents, or whoever is claiming the safe harbor represents, that it employs a review team of professionals with significant experience in the creative sector who are thoroughly trained on Shutterstock technical and metadata standards, as well as compliance policies? Or where in a deposition, one of your people says that the reviewers are trained and allowed to use their discretion to reject photos based on Shutterstock's standards. Are those factual parallels to cases that were resolved on summary judgment in favor of the service provider? Yes, actually. There are a couple of angles that relate to those points, one of which is the training is to train the reviewers who have at most 20 seconds an image on the terms of service. Why do you say they have at most 20 seconds per image? Maybe that's on average or something, but sometimes it takes 72 hours and buck up to the supervisory level to make that decision. That's very rare, and usually it's not. How rare is very rare? And does that create any kind of factual issue about what exactly is going on? It does not create any factual issue. First of all, the plaintiff had the opportunity to depose several witnesses in this case and ask those questions. And for what it's worth, the review is consistent with what the other platforms do. For what it's worth, Getty Images contributor platform still exists today, notwithstanding the fact that in a completely different context, they were not entitled to the safe harbor on a Rule 12 motion. So there's no issue here. Maybe yours will still exist, but have to be modified in some respects or pay people sometimes for things. After all, I'm not sure how much of a deposition they need when your web page says that the reviewers assess technical execution, which includes factors like lighting, focus, and noise for photo and video. There's a reason for that. I'm sure there's a good reason for it. It's because if it has poor focus and poor lighting and has a lot of background noise, it's not a very good photograph and you don't want to sell it. And that diminishes the quality and the attractiveness of your service if people have to plow through a lot of blurry photos before they find what they want. Well, for what it's worth, Judge Lynch, I actually checked on Wednesday to see if there were blurry photos on the site, and there are a lot. There are obvious technical issues. So there are people who abuse the platform. Just like there are people who won't report when there are violations that they know about, like the plaintiff, there are people who will abuse the platform. They will take hundreds of images that are just nonsense, noise, whatever it is, to try to get their foothold into this. That is not the kind—no one's sitting there and—these reviewers who are reviewing remotely—no one's sitting there and making these aesthetic  Yeah, but that's starting to sound like a question of fact, right? It would be a question of— The fact that you're sitting here telling us that people aren't doing that. And, I mean, doesn't that become triable then? It doesn't, because there's no evidence that they are. That's the thing, is that they didn't establish their burden of showing a genuine issue of material fact as to these points. They did try to throw in various parts of the other business. They tried to throw in statements from 2011, and Judge Reardon properly rejected those. But what's happening here is no different than what YouTube does or what these other platforms do. In fact, the only case that they cite, this Ninth Circuit case, involved a situation where two-thirds of the images were rejected. And for what it's worth, the issue in the case wasn't the review. The issue in the case was the employer responsibility over the reviewers. Yeah, but none of those cases are binding. We have to figure out what the answer is for ourselves, and I'm trying to figure out that. So I'm not really that interested in what a bunch of district judges around the country think with all respect to them. We're trying to figure out what the law actually requires and where the line is drawn. Right. So if two-thirds of the photos are rejected and only one, this is like Harvard, it depends on what your admission rate is, whether you're within the safe harbor or not. And if your admission rate gets up to 80%, then you're not really curating. But if your admission rate is, I'm sorry, then, yeah, right. If your admission rate gets up to 80%, then you're in the safe harbor. But if it's down around a third, that's different. Well, I think we're getting a little bit down into the nitty gritty. That's where we belong. This is a summary judgment decision. We are saying whether they are entitled to a day in court on this or not. And you know where you go to find that out? You go to the nitty gritty. And you figure out what the evidence is and what it proves or doesn't prove. Right. Well, the evidence is not tied to anything. So Section 512C is very clear. It says, it talks about protecting any activity using the material in the system or network. It excludes any kind of condition based on review. It is very clear that a limited review is not an issue. But let me give you a case where this did come up. In Viacom versus YouTube, Second Circuit decision. The people who were at YouTube actually said, I know that this is infringing. I'm looking at it. Let's leave it up until someone tells us. And that was not enough to avoid summary judgment. So how would you have us write what I'm calling the causation standard? Between when it gets broken, what are we supposed to do as a matter of law? Well, it's never broken. So the licensing relationship is this. The contributor, contrary to the contributor, decides what to upload. Shutterstock has a set license. And the license, if you look at just the Shutterstock and the licensee, that's only looking part of that nexus. The causal nexus goes all the way through. It goes from the uploader to the licensee. He admitted that he has recourse. He has sued. He said dozens. I don't think it's dozens. I think it's maybe five or six. But he sued because not many of them used these images, actually. He has sued many of these innocent licensees and received pretty good compensation for it. What he's trying to say, and again, this damages my client. My client exists to provide a platform for licensed imagery. And so this relationship that exists, the causal nexus is no different than in Downs versus Oath, which again is a district court case, but it is Judge Rakoff. And maybe it's very similar to the relationship in MP3 Toons, which again, they didn't find the safe harbor applied because of a repeat infringer policy, which again is not an issue here. But in MP3 Toons, a party uploaded to the locker. The content was downloaded from the locker to another party. So this causal nexus, there's no way to see a broken chain because it isn't from here. Yeah, I'm not so sure it's about broken chains either. And maybe I need to know more about copyright law as to whether these various original infringers can be sued. It would surprise me if they couldn't, but maybe that's right. But I'm just looking at the words of the statute that in C1, now we're not talking about whether you're a service provider. We're talking about the privileges of service providers. You can't be sued for infringement of copyright by reason of storage at the direction of a user of material. And I think Mr. Burroughs is saying, well, it's not just the storage as it is on YouTube where it's stored so that I can look at it. Thank you, YouTube. But it's licensed as well as stored. That's his first argument that he thinks is the clearer one, that the mere fact that you are selling like Amazon when it's a first party provider. And maybe we can go back to that. That's one issue. The other is at the direction of the user. And he's saying this is not at the direction of the user. The user proposes, but Shutterstock disposes. Shutterstock decides what goes up on the site. It doesn't simply store things at the direction of the user. So he says it doesn't simply store. It also acts as a first party to transactions. And secondly, it's not at the direction of the user. So we've been focused on that ladder with how much curation means that it's no longer at the direction of the user. He's got a problem. The problem is he agrees, everybody agrees, that you still are within the safe harbor if you cut out all the child porn. So where does that privilege end? Where do you reach the point where you are curating rather than simply trimming the really gross stuff that's illegal anyway? And the second thing that he's talking about is it's not simply storage. It's licensing. I'm not sure exactly where he gets the idea that there are no first party transactions allowed. And maybe you can address that. For example, is there case law that says that Amazon does not qualify for the safe harbor when it is selling itself as opposed to getting it from somebody, which I always look at how do I know who I'm getting it from so I never buy those things, that they only have the privilege for the ladder transaction and not the former? Is that the law of Amazon? So I'll try to take these one at a time. The first with respect to this purported curation. Everything gets through unless it's rejected. So it is at the user's direction. The only way that a user doesn't get in is if Shutterstock says, you're spamming. There's something sketchy about this. Then it comes down. So there's no curation. What they're citing to is a different part of the system, different part of it's old, it's not applicable. It doesn't get in the store unless it's accepted. No, it gets in the store unless it's rejected. It gets to you and it comes up somewhere on your site that I can't see it at their direction. Then you decide whether it goes in the store, right? No, really the way it works is it goes through unless there's an obvious policy flag, unless there's an obvious problem. I hear that, I hear, but that's not necessarily anything different than what I'm saying. That's about how much do you accept, but it does not get to where the user, the consumer user sees it without your approval. Okay, well Judge Lynch, I'll get right to that because putting that aside and maybe my adversary will tell us where in Section 512 there is a standard for enough review or not enough review. Viacom versus YouTube rejected the idea that just being a storage space is all you can do. Viacom versus YouTube says it extends the software functions performed for purposes of facilitating access. So Downs versus Oath, there was access facilitated. UMG versus Shelter Capital, the access to the music was facilitated. Vimeo, with which Your Honor was involved in that decision, the platform, the content goes up, it sits there, and then it gets available, it's made available to the public. So what's really dangerous here about the arguments that I've been hearing is that Section 512, there are all these arguments about this right or that right or what you can do or can't do. Section 512 says that the strict liability tort of copyright infringement, period, infringement of any right shall not apply to any type, direct, contributory, vicarious infringement where the certain conditions are met. And then it refers to any activity using the material in the system or network. It's incredibly broad, and it's that way for a reason. So Amazon e-books, under the plaintiff's decision, would close tomorrow. But I just felt like the court, I mean maybe I just read Viacom a little bit differently, but I felt like they expressed skepticism that licensing hand-selected content to a third party would be protected. I mean the part that I'm reading is the plaintiff argued with some force that business transactions do not occur at the direction of a user within the meaning of 512c1 when they involve the manual selection of copyrighted material for licensing to a third party. Now I know the court ultimately didn't decide the issue, but they remanded it for fact-finding. Yes, well that's a very different fact. So there were millions of videos on YouTube, and everything, despite that, that was fine. What the court remanded on was YouTube selected 2,000 of the videos, packaged them up. So they sat there and they said out of all of these, we want these 2,000 videos, packaged them up and sold them to AT&T, made them available for license. And they said, well that is a little bit more involvement. That's not, the user didn't decide to have those sent to AT&T. The user didn't lobby or petition to be in the 2,000 selected videos. So that's a very different scenario than what's going on here. This is, and for what it's worth also, we have this huge problem of the fact that now we've got a situation where copyright owners don't have to participate in the notice requirement either under this section. So my client ultimately, its brand is based on being a platform for legitimate material, and it operates just as all the other platforms do. So that relationship that happens, yes, there's a lot of volume that comes through. But the user essentially, I mean, they just don't want users scamming people. They don't want to be in this situation. They don't like what happened here. They get no benefit from it. So maybe we can move on to whether or not you acted expeditiously once receiving it. What do we do about, or how do we know that Shutterstock met its obligation under 512C1A3 with respect to the lingering infringement by Shutterstock's third-party users who access the library via the API, and the licensee who continue to use work? Right. So the API users have, I mean, there are hundreds of thousands of them as well. They access, the API just talks to what the content is that's currently on Shutterstock's site. When Shutterstock takes down the image, the API users should not have access to it. There were three that were identified of the thousands, three that were identified as not having taken, they must have made copies or something. They're not supposed to. They're supposed to refresh their cache routinely. With respect to the actual takedown, the one image, and it says one, by the way, the notice that was sent says Dr. McGuckin is the owner of one work. That was sent. Can we just focus on whether or not Shutterstock acted expeditiously? Is that a triable issue, whether or not they did enough? No. So all they have to do is act expeditiously to remove, and there are plenty of cases finding that even a window longer than the one that Shutterstock complied with or that met is good enough. So there was a notice that came in. It was an email. It didn't include the oath. So is that a question of law or a question of fact? It is a question of law. In fact, because we've got precedent on that, and we've cited the cases in our brief that show longer periods of time. So once Shutterstock got the notice on January 15, 2021, it took it down. It disabled access at the links that were identified, at the URLs that were identified, which, again, on summary judgment has also been found to be the standard, by January 19th, which I believe there was an intervening weekend. So 48 hours, 48 business hours, it was down everywhere. What should have happened, and what we believe did happen, is that anybody else who was using the network that the API uses to talk to the system, which, again, the contributors want to get their stuff licensed, it should have come down. But interestingly, and we never got an answer to this because every answer was, well, it's privileged, well, it's privileged. There was no notice sent to this party. There was no indication. No one told Shutterstock, hey, TinEye still has this available. And they didn't. The thing is that if you'd gone to TinEye and clicked on the link to get that image, it would have resulted in an error page. So the only thing that would have been available is a thumbnail anyway, and they've waived their arguments on thumbnails on appeal. Okay. If the presider will permit, I want to talk about the did not receive financial benefit directly attributable to an infringing activity part of C1B. My understanding of your colleague on the other side's argument is the same reason why you're not direction control of the user because of you have the reviewing process is why you exercise control over the selection and licensing of the photographs. Is there a reason why you could prevail on one but not the other, or do they rise and fall together? If we agree that the fact that you have an intervening decision of Shutterstock's employees to accept and list the photographs, does that mean that both of them go in the same direction or is there something about the way the two of these provisions work where you could prevail on one but not on the other? So these are different sections. So, again, it's just like the other platforms. This stuff all goes through unless it's got something, a violation of the terms of service, and the statute doesn't say. There are plenty of cases, again, so I decided in our brief and I can recite them here, that talk about policy violations, terms of service violations, and violate the terms of service. Sometimes something might be taken down because the party has already been picked. I'm sorry if I wasn't clear. Yes, but with respect to the other, so that's the one element. There's the other element of right and ability to control and financial benefit. Those two need to be present in order for there to take the party outside the safe harbor. So in IO versus VO, the court said you're accepting 200,000 images a day. You're offering the same price for everything. There's no substantial influence that just doesn't apply. Was there revenue derived from whatever this putative infringer did? There was. Was that derived because it was infringing? No. Shutterstock doesn't want revenue from infringement. It wants revenue from licensing. Right, but my understanding of the argument, and I apologize if I didn't phrase it as precisely, is that your colleague on the other side is saying because shutterstock individuals exercise some involvement in selecting which sites are going to go on, then that means that it is you don't qualify for the safe harbor with respect to direction and control of the user, and also that you did receive a financial benefit because you have the right and ability to control these activities. And my question to you is, is there something about the way these two provisions operate such that if we decide that there was some involvement or some legally meaningful involvement by shutterstock activities, do you have to lose on both of them, or can you lose just on one or not the other? Is the fact that there is a dispute over how much shutterstock does and whether or not it creates some sort of direction control on your part, do those two provisions rise and fall together? They shouldn't, Your Honor. The statute is incredibly broad and very flexible. So for what it's worth, shutterstock doesn't decide what channels it should be on. If an image is accepted, it goes on to the contributor platform. There's just one. And it's like the vending machine example. It's thrown into you get four or five different options depending on the use. Zero discretion involved in where it goes or how. None. It's only does it get rejected or does it get onto the platform. So I just want to make sure that that's clear because the record doesn't show anything different than that. But with respect to the financial, there's a sort of consolidation that I'm hearing. Financial benefit, because of right and ability to control, it doesn't say because. It says and. Those are two different elements. You have to show that there was a right. But it did get a financial benefit, so we're past that. It's a small one. It's maybe de minimis. Maybe they can get around it that way. But the issue, it always seemed to me here, was the second half of the and. So that's what we're talking about. And what Judge Perez keeps asking you is, is that the same issue of use or control? You can still win if you're right about we didn't really have the ability to control this. We didn't try to control it. All we did was this paring off of the far fringe end of things that are obviously impairing. Right? And is that your answer to both of those questions? I got it. So they are separate elements. I understand they're separate elements, but do they rise and fall together is the exact question. No, they do not. They do not. So what is the distinction? So VICOV versus U2 says that in that section on the right and ability to control, there must be substantial influence on the activities of the users, such as purposeful conduct. That's 676F3038. IO versus VO said there is no right or ability to control when it's receiving hundreds of thousands of video files from users. So they are different. What you're suggesting is this is what we have called the something more than the ability to take it down. Correct. And the question is what is the content that we give to something more? And it sounds like what you're telling me is maybe if the site advertised specifically get this photo cheap that happens to be infringing, so you're paying a small license fee to the wrong person or something like that, if there was some effort to channel the users, the consumer users, to these particular photographs, that would be a something more. Sure. That would be like phung, right? So in the phung case, I mean, here we've got 424 million images. So the idea that if it does it randomly, the idea is that, you know, when .0001% of people have had a claim, chances are it's not going to be random. When you're not doing anything to channel consumer users to these particular photo, infringing photographs, when you're not doing anything to generate revenues specifically from these, this is just a byproduct of the fact that they are on the site. Correct. Everything is agnostic to what ends up on, what gets through the gatekeeping or gets through the review process. And so the gatekeeping functions to the extent it functions at all, and you say it didn't. I understand that. It functions at the level of is this at the direction of the user? Yes. So the user wants the image up. The user can take the image down. Shutterstock can't say, no, no, please don't take that down. The user decides. They can license through Getty and Adobe. They can do whatever they want with the images. They can decide that they want to replace them. They can decide whatever it is. As long as it doesn't appear that someone's trying to take advantage of the site, it gets through. So when you talk about, you know, there's this case, obviously, again, Ninth Circuit, but great example, Fung, where Mr. Fung said it was a video transmission system. And Mr. Fung said, and this is why they lost the safe harbor, he said, come get your infringing movies here, free, pirated, whatever. I get that. I get that. I get that. But if you were running a service that said, we provide only the very best photographs. You can't just get on here because you feel like getting on here. We carefully select what goes on this site. We reject 85% of the people who ask to put their stuff on this site. You're getting class A wonderful pictures here. Would that take away the at the direction of the user part of the safe harbor? Is there any level of curation that would take you out of the safe harbor? In this circuit, I don't think any court has looked at that. Well, I know. We're here doing it. Correct. Well, but those aren't our facts. Judge Perez asked your adversary. I will ask you. If there is a line there, how do we draw it? What do we say about when, if ever, you lose? Maybe you're going to say, oh, all you have to say is, this level of curation is too small. And you don't really have to say what too small is because this is so small that that's the end of it. Thank you, Judge. You answered my question. But is there any line that we can draw? And we asked him the same thing. I don't think we got an answer from him either. There doesn't need to be any line drawing in this case. I agree with Your Honor. This is not the case for that. I don't want to legislate what the level should be. There are cases where, for example, a party might come in, go through someone's files, have a conversation with the party. What do you want to include? Let's decide this is going to be Class A stuff. Maybe there's some possibility where it moves out of what was intended to be a protection for those who are operating systems against strict liability for infringement. But at some point, it does stop. I would imagine there's some level at which a platform stops becoming that. And you're saying that all we need to say is Judge Reardon was right, that whatever level that is, this is not that. It can't be. I mean, it's in terms of the flow, in terms of the volume, in terms of the structures put in place, in terms of everything that's been done. This platform has been around for 20 years, and it was built on the DMCA just like Amazon eBooks is, just like all of these others. And certainly, all of these platforms, they review. They check. They monitor. Congress did not want to say, you should hide your head in the sand, and that will make you eligible for the safe harbor. Congress, in enacting the DMCA, said, you all will cooperate. You copyright owners, you'll send notices. You platforms, you will not be taken out of the safe harbor if you review. Review is encouraged by the DMCA. Section 512M expressly says that. And the legislative history talks about that. And the treaties talk about that. And Vimeo talks about that. So maybe there's something that's different. But we're talking about a digital platform, takes in content neutrally, spits it out under a set of systems. There's a human being's decision in about 10 seconds. So anyway, again, I think your honors job is a little easier than it might be in some other case. I think this one gives you a lot of leeway. Thank you. All right, thank you very much. Mr. Burroughs? Real briefly, your honors. First, speaking of the line drawing, when is any curation too much curation? We don't have to decide that. The Second Circuit decided that in Viacom. And it said, there's only a safe harbor when the curation process, quote, is fully automated and operates solely in response to user input without the active involvement of the website's employees. That's at pen site 40 of Viacom International, Inc. versus YouTube. That's the standard. I read that as saying that it has to be some kind of automated system, that it can't be reviewed by humans. It can't be anything other than an automatic thing that goes through and tries to catch, oh, this is Mickey Mouse, or this is pornography, or this is whatever it is. Your view is anything that's not that is too much? Well, that's allowed under 512M, a different portion of 512. So that would be allowed. But anything beyond that would not be allowed per the Second Circuit's standing rule. And this makes sense because once you have that human touch, and it's interesting to me that Shutterstock tells all of its clients that we have this highly curated, professional quality set of photographs, and then it's telling this court, we barely look at this stuff. We take almost everything in. It's just inconsistent. If anything, it creates a tribal issue of fact. Why is human involvement the barrier? If we've said that it's okay to do things that enhance accessibility, I mean, obviously computers are the right algorithm, I guess, to do all of that as well. But why is the people being involved, why does that make a difference in your view? It's not necessarily the case. In footnote 11 of the PolyBor decision, there is a reference to the Goldstein Treatise, and it says you don't look necessarily even at whether the process is automated or not. You look at what decisions are being made, and if you're making decisions about the quality of the content and whether or not it will appeal to your licenses. Whatever we may have said in passing in Viacom, Section M is pretty explicit. It doesn't say anything about automated versus human. It says that the applicability of the safe havens is not dependent on a service provider monitoring its service or affirmatively seeking facts that indicate infringement or removing and disabling access to materials where conduct is prohibited by law. So you're saying it's not a question of it's the humans that is the problem. The problem is what the humans do, and what the humans do includes aesthetic considerations. Exactly, Your Honor. In fact, we can imagine an AI reviewer that's also looking, you know, is this person smiling? Are their teeth showing? Is it blurry? Is there noise? Yeah, AI could decide we like this photo or we don't like this photo. And that would still take it outside of 512. That's why that footnote 11 is so important. Could I ask one other question that didn't really come up in the, I apologize, in either side's affirmative presentations? But suppose your client had objected to, well, first of all, let's assume for the sake of the argument, I know you disputed, that they did take down the one photo that you complained about in a timely way. So let's assume that we think that. If your client had objected to all of his photos that were on the site on the same basis, and they took them all down within the same time period or faster, as fast as you want it to happen, would you still be here? Would you still have a case? Yes, because that's only one reason. The 512 safe harbor, it's such a strong protection that there are a number of different things that an infringer has to do to avail itself of the protections. And taking things down in a rapid enough fashion is just one of them. Of course, if you really wanted it taken down fast, you could have complained about all of those photos, right? Well, that's the problem, Your Honor. We tried, and as you can see from the evidence in the case, even after the case was filed, they didn't take the material down. But that's not trying to get noticed, though. That's filing a lawsuit later. You didn't try to notice those other photos. Well, providing we believe that if they're going to ignore the takedown notices, filing a lawsuit is an even stronger way to try to force them to take it down. But even after filing the lawsuit, not only did they not take it down, they continued to host other photos. You saw we had to keep amending the lawsuit as we discovered more and more photos. You only noticed one photo, correct? When we learned of that first photo, yes. And so you were aware, when you became aware of the other however many hundreds of photos, you didn't notice those, correct? We filed the lawsuit, Your Honor. They actually say they took them down before you filed the lawsuit because of some other complaint that turned the person into a repeat infringer and made him suspect. Which is one of the reasons why a lawsuit had to be filed. One of the main contributors for the photos at issue in this case, Shutterstock was sued by another photographer for using hundreds of those photos. But despite that lawsuit, Shutterstock was still offering for sale photographs from this individual. So basically what I think you're saying is that the version of being able to ascribe, to take it out of what we would call strict liability land, depends on how narrowly or robustly one reads the safe harbor. I mean, right? That's basically what you're saying. That's why there's so many showings. It goes up, it doesn't matter what they do, it's been infringing, and they're on the hook unless we read the safe harbor broadly enough to get someone out of it. And that's why their defense rises and falls to such a degree on whether or not they vet it. And the representations being made about the vetting are just belied by the evidence. At the very least, it's a question of fact. Because you can go to the Shutterstock website right now, and what it says is our content, we have a, quote, global network of creative professionals that are, quote, that are reviewing the content for, quote, professional quality. And so in the record, there's an abundance of evidence that speaks to their- There's that evidence. When you say there's evidence on both sides, maybe it's in your favor, that the evidence on your side mostly comes out of their mouths. And it's even up today. I went to the website today, and all of these things were still there. They still have the contributor guides were there. And this is a bit to the something more point that you had, Judge Lynch. They provide these contributor outlines. If you want to get your stuff on our site, do this. Have the composition in this way. Use this type of lighting. Right now, for example, wellness and New Year's resolutions is big. So they say, look, send us photos of people doing yoga or drinking green juice. They influence their contributors. And to use the college admission point, they only accept, I think, 10% or 15% of the people that apply to be contributors. And that's one of the reasons- Well, wait, wait. Is that based on that 30,000 versus- 35,000 versus 350,000. What year is that from? That's taken from maybe 2011, 2012. But- Yeah, that was early in the early stages, right? But there's no reason to believe that's any different today. Well, there's no reason to believe you have any affirmative evidence that it's that way. And you had discovery galore that you could have asked that question, right? What is the rejection rate today? But I think the point is that there is- That is correct, right? You could have asked that. Absolutely. And we may have, Your Honor, and I may not. You did not ask that. No, I mean, then you have what you have. That's 15 years old. But let's be clear about what it is that you have, which is a number that dates from a time when the site was a tenth or less the size that it is now? More, a hundredth maybe of what it is now? But I think the important issue, Your Honor, is that they can reject. And that's one of the reasons why they're not like YouTube. They claim they're like YouTube, but anyone can post to YouTube. I don't have to apply to YouTube and have them approve me before I can post. YouTube doesn't license out its videos to other people. And there's no vetting on YouTube. I can go to YouTube right now and put up a video of my dog. That's the terrible quality. YouTube is going to host it. That is not Shutterstock. Shutterstock vets every piece of content. And then going to Judge Perez's question about the line drawing, I think we have a good starting point in Polyvore. And I know that we didn't have a full panel decision. But in Judge Newman's portion, he writes that the line can be drawn whenever a website operator moves, quote, from a passive provider of a space in which infringing activities happen to occur to an active participant in the process of copyright infringement. So once they become a passive, you know, they can be a passive provider, they're within the 512 protection. But once they become an active participant in the process of copyright infringement, they're no longer subject to the 512 safe harbor. I think we have your arguments. Thank you both very much. We'll take the case. Yeah, we appreciate the arguments, and we appreciate that we kept you over time. And we hope we were able to cover all the ground and understand all of the points you wanted to make. Thank you. Thank you, Your Honors.